```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- x
WILLIAM and MARGARET CUFF, on behalf     :
of their minor son, B.C.,                :
                                         :
               Plaintiffs,               :
                                         :
          -v-                            :    07 Civ. 10996 (JSR)
                                         :
VALLEY CENTRAL SCHOOL DISTRICT and       :    OPINION AND ORDER
BARBARA KNECHT, sued in her              :
individual capacity,                     :
                                         :
               Defendants.               :
---------------------------------------- x
```

JED S. RAKOFF, U.S.D.J.

Plaintiffs William and Margaret Cuff bring this § 1983 action on behalf of their son, "B.C.," to challenge disciplinary measures taken by school administrators after B.C., in connection with a class assignment, made a drawing perceived to be threatening and violent. Plaintiffs allege that by suspending B.C. and thereafter refusing to expunge his disciplinary record, defendants Valley Central School District and Barbara Knecht, the principal of B.C.'s elementary school, violated B.C.'s First Amendment right to free expression. By Opinion and Order dated May 5, 2008, my late colleague, the Honorable William C. Conner, U.S.D.J., to whom the case was then assigned, granted defendants' motion to dismiss the complaint for failure to state a claim. Cuff ex rel. B.C. v. Valley Cent. Sch. Dist. ("Cuff I"), 559 F. Supp. 2d 415 (S.D.N.Y. 2008). Plaintiffs appealed, and the Second Circuit vacated that ruling, holding that the facts alleged in the complaint did not compel the conclusion that B.C.'s speech was unprotected by the First Amendment. Cuff ex rel. B.C. v.

Valley Cent. Sch. Dist. ("Cuff II"), 341 F. App'x 692 (2d Cir. 2009) (summary order). After remand, and upon Judge Conner's untimely demise, the case was transferred to the undersigned. Following completion of discovery, defendants moved for summary judgment. The Court received briefing and held oral argument on February 4, 2010. Having carefully considered the parties' submissions, the Court now grants defendants' motion and awards summary judgment in defendants' favor.

The pertinent facts, undisputed or, where disputed, taken most favorably to the plaintiffs, are as follow:

At the time of the incident resulting in his suspension, B.C. was ten years old and in the fifth grade at Berea Elementary School in Montgomery, New York. Pls' Reply to Defs' Rule 56.1 Statement ("Pls' 56.1") ¶¶ 13-14.[1] Prior to the incident in question, B.C. had been disciplined by teachers and school administrators on a number of occasions for misbehavior on the school bus, during recess, in the hallway, and in the cafeteria. Id. ¶¶ 17-18. In connection with a March 2007 incident in which B.C. was believed to have shoved another student and given his bus driver the "middle finger," Assistant Principal Janet Malley gave B.C. four days of lunch recess detention and advised Mr. and Mrs. Cuff that further misbehavior could result in suspension of B.C.'s bus privileges. Id. ¶¶ 20-21. In connection

---

[1] The citations to the plaintiffs' reply to the defendants' statement of undisputed facts under Rule 56.1 of the Local Civil Rules of the Southern District of New York incorporate by reference the corresponding paragraphs of the defendants' Rule 56.1 statement.

with these and other incidents, B.C. had also been sent to the principal's and assistant principal's offices on several occasions. Id. ¶¶ 84, 86.

Furthermore, prior to making the drawing from which this litigation arises, B.C. had drawn a picture that was perceived by school staff as disturbing.  This drawing, made by B.C. in January 2006 in response to a third-grade class assignment, depicted a person shooting bullets at a group of four people.  Above this drawing, B.C. wrote: "One day I shot ~~someone~~ 4 people each of them got fo[u]r blows + they were dead.  I wasted 20 bulits [sic] on them."  Declaration of Adam I. Kleinberg dated 12/9/09 ("Kleinberg Decl.") Ex. J, at 2. B.C.'s teacher reported this incident to the school psychologist, Delaine Charette, and school officials called B.C.'s parents about the drawing.  Pls' 56.1  ¶¶ 26, 31.  At his deposition in this lawsuit, B.C. testified that this drawing was intended to depict a paintball game and that he thought he probably explained this to Charette, although Charette denies that B.C. ever informed her that he was portraying a game of paintball.  Id. ¶¶ 29-30; Kleinberg Decl. Ex. D (Deposition of B.C., 11/11/09), at 62-63.  Mrs. Cuff testified at her deposition that B.C. had played paintball "since he was a little boy," and Mr. Cuff testified that the Cuffs had a paintball course on their property.  Kleinberg Decl. Ex. E (Deposition of Margaret Cuff, 11/2/09), at 33; id. Ex. F (Deposition of William Cuff, 11/2/09), at 17-18.

The record also includes evidence of still other writings involving themes of violence and death.  B.C.'s authorship of some of

3

these writings is disputed (and therefore cannot play a part in the determination of this matter except as it informs the context of defendants' response to the drawing here in issue), but in other cases the authorship is conceded.  Among the disputed writings is one that surfaced in the spring of 2007, while B.C. was in fourth grade, and which led to psychologist Charette's being notified by B.C.'s teacher that B.C. had written a disturbing story about squirrels. Pls' 56.1 ¶ 36.  This story, which defendants assert but plaintiffs dispute was written by B.C., is believed by defendants to have been part of a classroom assignment in which students rotated from computer to computer to complete each others' stories.  (While B.C. denies writing this story, he admits to receiving this general sort of assignment involving switching computers.  Id. ¶¶ 36, 39.)  The story reads as follows:

> Once upon time there was a squirrel named ~~Fatbastard~~ B['s name] he was really fat and everyone thought he was simple minded he got all the squralles in the world to kill humans. Then a week later they killed everyone except me I fought back and I killed a lot of squrels in the world but they know I'm stalking them then when the time is ready I'm gona kill al of them at once because I am killing each squle slow really slow.  Soon there was one squirrel left, B['s name]!

Kleinberg Decl. Ex. J, at 3.

Among the writings that B.C. does not dispute were written by him was a story he wrote as part of a fourth grade classroom assignment that reads as follows:

> All of a sudden a big wind blew my brother to Japan and I never saw him again.  Then the big wind destroyed every school in America.  Than every body ran for there life and than all adults died and all the kids were alive.  Then all the kids died.

4

Kleinberg Decl. Ex. J, at 4.  This story was also reported to Charette, although she did not speak with B.C. about it, and B.C. was not punished for it, although B.C. did attend a peer discussion group at a student assistance counselor's behest.  M. Cuff Dep. at 39-40; W. Cuff Dep. at 53-55; Pls' 56.1 ¶¶ 40-42.

The incident that launched this litigation took place on September 12, 2007.  B.C.'s teacher, Tara DeBold, gave each member of B.C.'s fifth grade class a paper copy of an astronaut figure and told each student to write various things in corresponding sections of the astronaut figure: among other things, they were instructed to write a "wish" in the left leg of the astronaut.  Pls' 56.1 ¶¶ 46, 49.  In his astronaut's left leg -- the spot designated for him to indicate his "wish" -- B.C. wrote in pencil, "Blow up the school with the teachers in it."  Id. ¶¶ 53-54; Kleinberg Decl. Ex. O (astronaut drawing).  As B.C. admits he knew, these drawings were intended to be posted in the school's hallways in time for an open school night for parents.  Pls' 56.1 ¶¶ 57-58.  B.C. testified, however, that he did not intend to submit his drawing because his handwriting was "crap" and because the drawing was not for a grade -- although he also admits that he never informed DeBold of this intention.  Id. ¶¶ 59-60; B.C. Dep. at 13, 16.

DeBold learned of B.C.'s drawing after another student, C.P., brought it to her attention.  Pls' 56.1 ¶ 73.  Although students worked on the drawings individually, B.C. was seated at a block of six desks pushed together, and B.C. told his neighbors about what he was going to write in his picture.  Id. ¶¶ 62-64.  These students

5

laughed in response. Id. ¶ 64. C.P., a female student who was sitting in a neighboring group of desks, heard from another student about what B.C. drew, and went over to B.C.'s desk to look at his picture. Id. ¶ 66-68. C.P. then approached DeBold about the incident. Id. ¶ 73.[2] DeBold came to B.C.'s desk to look at the picture. Id. ¶¶ 73-74, 78. DeBold testified that she asked B.C. if he meant what he had written, but B.C. did not respond to her question. Kleinberg Decl. Ex. N (Deposition of Tara DeBold, 11/4/09), at 10. At his deposition, B.C. testified that he was joking and denied that DeBold asked him if he meant what he had written, but admitted that he did not tell DeBold that he meant the drawing as a joke. B.C. Dep. at 17, 24-25.

In any event, DeBold then filled out a referral form and sent B.C. and the astronaut picture to the principal's office. Pls' 56.1 ¶ 82. When B.C. came to her office, Principal Knecht reviewed his drawing and asked him to explain what he meant. Id. ¶ 99. B.C. testified that he told Knecht that he did not mean what he wrote in the drawing and was just joking, id. ¶ 102, and this must therefore be taken as true for purposes of this motion, although Knecht denies that anything of the sort happened and instead attests that B.C. told her he wanted to write the threat and meant it, id. ¶ 101. Assistant Principal Malley then joined the meeting. Id. ¶ 105. At this point,

---

[2] At her deposition, DeBold stated that she was concerned that C.P. got out of her seat to report the incident and recalled that C.P. looked very worried. B.C., however, testified that C.P., like the other students, laughed when she saw B.C.'s picture, and that C.P. was a "tattletale" who had gotten him in trouble for earlier incidents. Pls' 56.1 ¶¶ 71, 75-76.

6

B.C. told them he wrote his "wish" because his teacher told him he could write anything he wanted. Id. ¶ 109.[3] Knecht took notes of this meeting and B.C. signed a copy, but B.C. testified at his deposition that he cannot read handwriting, like Knecht's, that is in script. Id. ¶¶ 111-13.

Knecht then asked B.C. to leave her office and called the district's superintendent, Dr. Richard Hooley, to advise him of the situation. Id. ¶ 119. Knecht and Malley told Dr. Hooley that they believed the drawing had frightened another child, alarmed the teacher, and could have been displayed at the parents' night, and that B.C. could have acted on his threat. Id. ¶ 123. At the end of the call, Knecht decided that B.C.'s punishment would consist of a five-day out-of-school suspension, followed by a one-day in-school suspension. Id. ¶ 124. Dr. Hooley agreed with this decision. Id. ¶ 127.

Mr. and Mrs. Cuff, who had been called to the school, then arrived and were informed of the punishment. Id. ¶¶ 128-29. At this time, Knecht prepared a letter formalizing the punishment and concluding that B.C. had made a "written violent threat against Berea Elementary School and its occupants." Id. ¶ 132; Kleinberg Decl. Ex. U (letter dated 9/12/07). The school district's Code of Conduct designates an out-of-school suspension, like that imposed here, as the tenth most severe punishment on a list of twelve possible

---

[3] B.C. testified that DeBold, after being pestered by students about what sorts of things they could write, told them that they could write about "anything," and gave as an example "missiles." Pls' 56.1 ¶ 51.

punishments for students making threats of violence.  Kleinberg Decl. Ex. T (Code of Conduct), at 9.  The Cuffs themselves punished B.C. for the incident by grounding him for two to three weeks and not letting him play video games during that time.  Pls' 56.1 ¶ 134.

On September 25, 2007, after B.C. had completed the term of his suspension, plaintiffs' counsel wrote a letter to Dr. Hooley appealing the decision and requesting that the portion of B.C.'s disciplinary record relating to this incident be expunged.  Kleinberg Decl. Ex. V.  In preparation for a meeting with the school district's Board of Education regarding the appeal, Dr. Hooley reviewed the materials in B.C.'s file, including the aforementioned writings and disciplinary incidents, as well as memos about these incidents that were prepared after the punishment was imposed.  Pls' 56.1 ¶¶ 139-40.  On October 10, 2007, the Board notified plaintiffs that it had "affirmed and upheld the decision of the Principal in its entirety."  Kleinberg Decl. Ex. Y.

Against this background, the Court now turns to plaintiffs' claim that punishing B.C. for his drawing violated his First Amendment rights.  As the Second Circuit noted in Cuff II, under the First Amendment "student expression may not be suppressed unless school officials reasonably conclude that it will 'materially and substantially disrupt the work and discipline of the school.'"  341 F. App'x at 693 (quoting Morse v. Frederick, 551 U.S. 393, 403 (2007)) (internal quotation marks omitted).  Moreover, in applying this standard, schools may not prohibit speech merely based on "undifferentiated fear or apprehension of disturbance."  Morse, 551

8

U.S. at 408 (quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 508 (1969)) (internal quotation marks omitted). Summary judgment in favor of defendants on this First Amendment claim is therefore proper only if "'no reasonable jury could disagree,' based on the summary judgment record," taken most favorably to plaintiffs, "that the student's speech 'would foreseeably create a risk of substantial disruption within the school environment.'" Cuff II, 341 F. App'x at 693 (quoting Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist., 494 F.3d 34, 40 (2d Cir. 2007), cert. denied, 128 S. Ct. 1741 (2008)).

  The Court's application of this "substantial disruption" test to the events surrounding the instant case is considerably aided by the Second Circuit's decision in Wisniewski v. Board of Education of Weedsport Central School District, 494 F.3d 34 (2d Cir. 2007). Wisniewski, like this case, involved punishment for a drawing claimed by a student to be a joke but interpreted by school authorities to be a threat. The student in Wisniewski, an eighth-grader named Aaron, generated a so-called "buddy icon" visible to those with whom he communicated via instant messaging software from his parents' computer. Aaron's icon depicted a gun shooting bullets at a person's head, from which blood spattered. The icon bore the legend "Kill Mr. VanderMolen" -- Mr. VanderMolen being Aaron's English teacher. The icon was visible to members of Aaron's instant messaging "buddy list," some of whom were his classmates, for a period of three weeks. Mr. VanderMolen learned of this icon after another student brought it to his attention, and he reported the matter to the school principal

and the police.  Both the police investigator and a psychologist ultimately determined that Aaron had meant the drawing as a joke, but the school officials nonetheless suspended him for five days as a temporary measure, and then for a semester following a superintendent's hearing.  Id. at 35-37.

The Court of Appeals in Wisniewski rejected Aaron's First Amendment challenge to his suspension.  The Court assumed arguendo that Aaron's icon was protected speech, but held that "the risk of substantial disruption" arising from the icon's transmission was "not only reasonable, but clear," and that there could be "no doubt that the icon, once made known to the teacher and other school officials, would foreseeably create a risk of substantial disruption within the school environment."  Id. at 40.

In Cuff II, the Second Circuit, in holding that the instant case could not be dismissed on the pleadings, thought that a developed record might reveal facts distinguishing this case from Wisniewski, such as that "B.C. had no other disciplinary history that would suggest a violent tendency." Cuff II, 341 F. App'x at 693. But the now developed record entirely contradicts this conjecture. Indeed, it is now uncontested that, even on B.C.'s account, B.C. had a substantial disciplinary history, all of it tied to suggestions of violent tendencies, and that this was known to the individual defendant here, Barbara Knecht, as well as to the school district generally.  Similarly, the speculation in Cuff II that B.C. might not have shown his drawing to other students, see 341 F. App'x at 693, has now been definitively contradicted by undisputed evidence that

establishes that not only did B.C. show his assignment to other students, but also it was only after his drawing prompted a classroom commotion that another student learned of the drawing and informed the teacher of what had occurred.[4]

As to those distinctions mentioned in Cuff II that still remain -- that B.C. was a few years younger than the eighth-grader plaintiff in Wisniewski, and that B.C.'s threat was made "in direct response to a school assignment," 341 F. App'x at 693 -- the Court finds them immaterial as a matter of law in the context of the undisputed facts that have now emerged. Indeed, while the incident here took place in an elementary rather than middle school, B.C.'s relative youth arguably augments rather than constricts the scope of the school administrators' discretion. See, e.g., S.G. ex rel. A.G. v. Sayreville Bd. of Educ., 333 F.3d 417, 423 (3d Cir. 2003) (noting, in upholding the suspension of a kindergartner for statements made during a game of cops and robbers at recess, that "a school's authority to control student speech in an elementary school setting is undoubtedly greater than in a high school setting"). And although B.C.'s wish to "blow up the school with the teachers in it" was expressed in response to a classroom assignment instead of in a private communication between B.C. and his friends, this fact only reinforces the reasonableness of defendants' belief that this writing should be treated as a threat rather than a joke.

---

[4] Cuff II also deemed it relevant that B.C.'s drawing was allegedly made in crayon. See 341 F. App'x at 693. It is now uncontested that the drawing was made in pencil, though the relevance of the medium eludes this Court.

In response, plaintiffs point to testimony that, although disputed by defendants, must be taken as true for purposes of this motion: (1) during her meeting with Mr. and Mrs. Cuff, Knecht referred to the punishment as arising from a "zero tolerance policy" triggered by the "threat" written in the astronaut drawing alone, and stated that she did not presently have access to B.C.'s records (M. Cuff Dep. at 47-49; W. Cuff. Dep. at 71); (2) Knecht did not mention B.C.'s disciplinary history during that meeting (Kleinberg Decl. Ex. M (Deposition of Barbara Knecht, 11/4/09), at 57); (3) Knecht did not specifically know of the paintball drawing or the squirrel story at the time she imposed the suspension (Kleinberg Decl. Ex. K (Deposition of Delaine Charette, 11/20/09), at 11-12); and (4) Knecht did not speak to DeBold about the astronaut incident, or to Charette about any previous violent writings, until after she decided to suspend B.C. (DeBold Dep. at 19).  This is hardly sufficient to create a material issue, however, given that it is undisputed that Knecht and Malley knew of B.C.'s prior disciplinary incidents at the time of his suspension, and that Knecht had previously discussed B.C.'s prior writings with Charette in general terms.  Pls' 56.1 ¶¶ 84, 86-87, 89; Charette Dep. at 12.

Moreover, plaintiffs' arguments in this regard ignore the standard for resolving conflicts between student speech and discipline set out in the seminal Supreme Court case of <u>Tinker v. Des Moines Independent Community School District</u>, 393 U.S. 503 (1969). Whether otherwise protected speech can support student discipline turns, under <u>Tinker</u>, on the presence or absence of facts that "might

12

reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." 393 U.S. at 514. Under this standard, defendants need not prove that school administrators' initially-stated justifications for punishment fully incorporate all the objective facts that could support a likelihood of substantial disruption, and they need not demonstrate that substantial disruption was inevitable. See, e.g., Doninger v. Niehoff, 527 F.3d 41, 51 (2d Cir. 2008) ("The question [under Tinker] is not whether there has been actual disruption, but whether school officials 'might reasonably portend disruption' from the student expression at issue."); DeFabio v. E. Hampton Union Free Sch. Dist., 658 F. Supp. 2d 461, 481 (E.D.N.Y. 2009) ("Not only are school officials free to act before the actual disruption occurs, they are not required to predict disruption with absolute certainty to satisfy the Tinker standard. Although plaintiffs seek to second-guess with hindsight the judgment of school administrators, that is not the role of the courts."). Indeed, an actual disruption standard would be absurd; as the Sixth Circuit has noted, such a theory would place school officials "between the proverbial rock and hard place: either they allow disruption to occur, or they are guilty of a constitutional violation." Lowery v. Euverard, 497 F.3d 584, 596 (6th Cir. 2007). "Such a rule is not required by Tinker, and would be disastrous public policy: requiring school officials to wait until disruption actually occurred before investigating would cripple the officials' ability to maintain order." Id.

Given what B.C. wrote in his astronaut drawing, which on its

13

face threatened violence and the destruction of property, coupled with the school administrators' general knowledge of his prior disciplinary history and similar past writings, no reasonable fact-finder could find that a prediction of a likelihood of substantial disruption was unreasonable.

Plaintiffs' remaining arguments similarly fail to create a genuine fact issue that defendants acted unreasonably. They stress that B.C. told his teacher and the administrators that the drawing was a joke, that he never intended to have it posted in the hallway, and that in any event, he clearly lacked the capacity to carry out the supposed threat. Although the Court accepts these contentions as true for purposes of summary judgment, they do not undermine the reasonableness of defendants' response. First, even if B.C. meant the drawing to be a joke, the fact remains that he showed it to other students and knew that the assignment was intended for public display. Under Tinker, it is the objective reasonableness of the school administrators' response, rather than the student's private intentions, that are relevant. Thus, the Wisniewski court, in affirming summary judgment in favor of the school administrators despite the student's protestation that his icon was meant as a joke, concluded that "the risk of substantial disruption is not only reasonable, but clear." 494 F.3d at 40; cf. Morse, 551 U.S. at 401 (holding, for purposes of summary judgment, that the principal was reasonable in interpreting a student's banner reading "BONG HiTS 4 JESUS" as promoting illegal drug use, despite the student's claim that "the words were just nonsense"). And because Wisniewski held

14

that a student's generation and transmission of a buddy icon to his friends from his parents' home computer can support a reasonable probability of substantial disruption, surely a drawing made in response to a classroom assignment intended to be displayed publicly -- and in fact shown to other students -- would also qualify.

Finally, whether or not B.C. had the capacity to "blow up the school," or was at all likely to do so, is not dispositive, and indeed has only minimal relevance. As Judge Conner reasoned, and as the undisputed facts now substantiate, the defendants "could reasonably have viewed B.C.'s writing as a general indication of violent intention or propensity, notwithstanding the fact that he might have been unable to perform the specific violent act he threatened. . . . [E]ven an unsuccessful attempt at violence has significant disruptive potential, as does the making of the threat itself." Cuff I, 559 F. Supp. 2d at 422. For this Court to hold otherwise, and thereby in effect to require school administrators to conduct a detailed capacity assessment before reacting to students' threats of violence, would place educators in an untenable position, and place students and teachers at an unreasonable risk of danger. See, e.g., Ponce v. Socorro Indep. Sch. Dist., 508 F.3d 765, 772 (5th Cir. 2007) ("School administrators must be permitted to react quickly and decisively to address a threat of physical violence against their students, without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance.").

Having determined that no reasonable fact-finder could fail

15

to conclude that B.C.'s drawing was not shielded from punishment by the First Amendment, the Court turns to plaintiffs' fallback claim that the extent of B.C.'s punishment independently violated his constitutional rights.  Judge Conner rejected this claim Cuff I, 559 F. Supp. 2d at 422-24, and the Second Circuit did not reach the issue in Cuff II.  But this Court essentially agrees with Judge Conner's analysis.  Quite aside from the fact that plaintiffs are unable to cite any case where school discipline has been held unconstitutionally excessive, defendants' calibration of the extent of B.C.'s punishment is "exactly the sort of discretionary decision making that is entitled to deference from this Court."  Cuff I, 559 F. Supp. 2d at 424.  "It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion."  Wood v. Strickland, 420 U.S. 308, 326 (1975).  Here, in light of what school administrators reasonably perceived to be a violent threat and B.C.'s prior disciplinary history, B.C.'s six-day suspension comes nowhere close to the sort of irrational, draconian punishment that might theoretically warrant constitutional limitation.

     For the foregoing reasons, defendants' motion for summary judgment is hereby granted in its entirety, and there is thus no need for the Court to reach defendant Knecht's assertion of qualified immunity.  The Clerk of the Court is directed to enter final judgment in favor of defendants and to close document number 24 on the Court's docket.

     SO ORDERED.

Dated: New York, NY
       May 26, 2010

_____
JED S. RAKOFF, U.S.D.J.